Jeremy B. Sporn
Federal Defenders of Eastern Washington and Idaho
306 East Chestnut Avenue
Yakima, Washington 98901
(509) 248-8920

Attorneys for the Defendant

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON
The Honorable MARY K. DIMKE

| United States of America, | Case No. 4:20-cr-6002-SAB |
| Plaintiff, | **Motion for Release from Detention** |
| v. | Richland - With Oral Argument |
| Jose M. Lopez-Orduno, | April 14, 2020, at 2:30 |
| Defendant. | |

The defendant, Jose M. Lopez-Orduno, respectfully moves this Court for an order releasing him from custody on strict conditions, pending his trial, currently scheduled for July 13, 2020. Mr. Orduno was arrested by agents following a traffic stop on December 17, 2019, in the parking lot outside the Franklin County courthouse in Pasco. He was fully compliant with the officers during that stop (video and audio recordings were provided in discovery), and was not restrained prior to being formally arrested. Based on the subsequent recovery of about several ounces of methamphetamine from the vehicle, a complaint was filed on December 20, 2019, charging Mr. Orduno with possessing at least five grams of methamphetamine with intent to distribute. He was presented on the complaint, and counsel was appointed. A bail hearing was conducted on December 27,

Motion for Release from Detention

at which the Court found that Mr. Orduno had not rebutted the presumption of detention, and ordered him detained pending trial.

Since then, two developments warrant revisiting that finding, and ordering Mr. Orduno released on strict conditions.  First, he proposes a more stable release address with his cousin in Pasco with whom he has a close relationship.  Defense counsel will make the relevant details known to the Pre-Trial Services office in advance of the hearing.  Mr. Orduno proposes to reside with his cousin, his cousin's wife and their young child, in a home that is free of firearms, and where neither adult is believed to have a criminal record.  Second, because of the COVID-19 pandemic and the unique and heightened risks that the outbreak poses to those in custody like Mr. Orduno, release is now firmly in the public interest and would mitigate the risk of further transmission.

**Facts and Procedural Background**

On January 7, 2020, the government secured an indictment, which charged Mr. Orduno in three counts: first with conspiring with Angelica Sanchez and others to distribute and possess with intent to distribute at least 50 grams of actual methamphetamine (21 U.S.C. § 846); possessing at least 5 grams of actual methamphetamine with the intent to distribute (based on what was recovered during the December 17 traffic stop); and with possessing stolen firearms in violation of 18 U.S.C. § 922(j) (also based on contraband recovered during the same traffic stop).  The indictment also charged Ms. Sanchez in two additional counts with possessing at least 50 grams of actual methamphetamine and with possessing with intent to distribute an unspecified

Motion for Release from Detention

quantity of fentanyl. Those latter two counts were based on a search of Ms. Sanchez's motel room in Quincy on December 18, the day following Mr. Orduno's arrest. The government obtained a superseding indictment in March that similarly alleges the same five counts, but appears to add two additional co-conspirators. Mr. Orduno would not know, however, because of the government's cloak-and-dagger redactions. At the least, Mr. Orduno is entitled to know with whom he is alleged to have conspired, the government's apparent need for secrecy notwithstanding.

Mr. Orduno, meanwhile, had moved in February 2020 to continue the trial to July 2020, which was granted. Ms. Sanchez, for her part, was arrested in late February, and the government moved for joinder with Mr. Orduno. Over her objection, Judge Bastian ordered a joint trial as to both co-defendants, and scheduled it for July 2020, which remains pending. To Mr. Orduno's knowledge, the unnamed co-conspirators have not been arrested or yet joined for trial with him and Ms. Sanchez.

At the first bail hearing, conducted prior to the outbreak of the Coronavirus in the United States, Mr. Orduno had proposed living in Quincy with relatives. Just before that hearing, Mr. Orduno's cousin had made the Pretrial Services office aware that his parents did not provide permission to have Mr. Orduno live with them. Instead, Mr. Orduno proffered that his cousin would be able to rent an apartment for him in the Quincy area, where Mr. Orduno had been living, and that they would live together or that Mr. Orduno would live in the apartment by himself. Defense counsel did not present any argument as to the COVID-19 Coronavirus; there was not yet a confirmed case in the United States.

Motion for Release from Detention

Thus, the issues raised in this motion are new and were not previously considered as part of the Court's decision whether or not to release Mr. Orduno.

Mr. Orduno is 24 and a Mexican citizen, but has legal permanent resident status in the United States. He does not have or know where his passport is located. He had relatively recently relocated to the Washington area, after living in Utah for a period of time before that, and Washington before that. Up until recently, Mr. Orduno has been working in the construction industry, doing mostly asphalt and insulation work. It is believed that if released, he would be able to find insulation work in the Tri-Cities area. Mr. Orduno has two daughters to support, as well as his step-daughter through Ms. Sanchez, who remains in custody herself.

At the time of the initial bail hearing in December, there was some confusion as to whether either of his children reside in Mexico. However, believe both children live in the United States; the miscommunication appears to be that his daughter was visiting Mexico on vacation at the time of his arrest, but resides permanently with her mother in San Diego. As the Court is aware, Mr. Orduno has been in a romantic relationship with his co-defendant for the past several years. Mr. Orduno's father remains in Mexico, and has occasional telephonic contact, while his siblings live in the United States. Thus, while he lacks the most extensive ties to the community that the Court will see, Mr. Orduno has lived in the Washington area for a period of time, and appears to have multiple relatives here, and the center of gravity of his life has shifted from Mexico to the United States. Mr. Orduno does not have a criminal record.

Motion for Release from Detention

In this extraordinary time, courts should look to release (and have been releasing, in fact) pre-trial detainees who (1) are not charged with a violent offense, (2) do not have a history of violence, (3) do not have a history of failing to appear at court proceedings, (4) do not have an extensive criminal history, and who (5) have some ties to the local community or legal status in the United States. Mr. Orduno meets all of these criteria. If he was not an ideal candidate for release previously, even with the new proposed release address in Pasco, the changed circumstances warrant a different outcome now. We acknowledge that the new developments do not affect or counter all of the concerns the Court raised in originally ordering Mr. Orduno detained. However, difficult times call for difficult decisions, and even if release on conditions is disfavored or problematic, the alternative may well be worse both for Mr. Orduno and others. *See United States v. Davis*, 2020 U.S. Dist. LEXIS 55310, at *19 (D. Md. Mar. 30, 2020) (granting release on conditions after noting that "these are not ordinary times. The current public health crisis has upended the world as we know it").

## Legal Standards

Shortly after the passage and implementation of the Bail Reform Act, the Ninth Circuit declared that "[o]nly in rare circumstances should release be denied." *See United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985). That pronouncement was in keeping with what the Supreme Court affirmed two years later in the seminal Bail Reform case, which was that pre-trial detention still remained disfavored. *See United States v. Salerno*, 481 U.S. 739, 755 (1987) ("In our society liberty is the norm, and

Motion for Release from Detention

detention prior to trial or without trial is the carefully limited exception.").  Close cases should result in release, as any "[d]oubts regarding the propriety of release should be resolved in favor of the defendant." *Id.*; *see also United States v. Diaz-Hernandez*, 943 F.3d 1196, 1198 (9th Cir. 2019); *United States v. Santos-Flores*, 794 F.3d 1088, 1090 (9th Cir. 2015) (echoing same legal standards); *United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991) (re-affirming same guiding principles well after Bail Reform Act became anchored in federal consciousness and practice). The Bail Reform Act "*mandates* release of a person facing trial under the least restrictive condition or combination of conditions that will reasonably assure the appearance of the person as required." *Motamedi*, 767F.2d at 1405 (emphasis added).  It speaks of reasonable assurances, not guarantees, a standard that would otherwise be impossible to satisfy prospectively.  *See United States v. Orta*, 760 F.2d 887, 891-92 (8th Cir. 1985).

In spite of the presumption favoring detention – a presumption which arguably was never meant to apply to someone like Mr. Orduno with the same force as for more violent, prolific and exalted drug and violent racketeering defendants that the Bail Reform Act targets, *see Salerno*, 481 U.S. at 743-45, 750-52; *United States v. Jessup*, 757 F.2d 378, 384 (1st Cir. 1985) – the Government retains the overall burden of persuasion.  *See United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008); *Gebro*, 948 F.2d at 1121; *United States v. Rodriguez*, 950 F.2d 85, 88 (2d Cir. 1991); *United States v. Ward*, 63 F. Supp. 1203, 1209 (C.D. Cal. 1999).  This distinction is often obscured, as the defendant has only the burden of production, to come forward with *some* evidence that

cuts against flight risk or danger to the community.  *See United States v. Hunt*, 240 F. Supp. 2d 128, 131 (D.D.C. 2017) (noting that the defendant need only present "some credible evidence contrary to the statutory presumption").  That burden is limited and not terribly heavy.  *See Hir*, 517 F.3d at 1086; *see also United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001) (noting that defendant bears only a "limited burden of persuasion").

It is not that the Court becomes empowered to ignore or overlook the presumption of detention entirely.  However, it is appropriate to engage in a case-by-case analysis that permits ascribing varying degrees of evidentiary weight to the presumption depending on the extent to which the defendant and his case based on the proffered facts matches the "congressional paradigm" of the defendants and cases that Congress intended to reach.  *See United States v. Palmer-Contreras*, 835 F.2d 15, 17-18 (1st Cir. 1987); *see also United States v. Marino*, 731 F. Supp. 2d 326 (S.D.N.Y. 2011) (describing effect of statutory presumption, even for reputed boss of Gambino organized-crime family, as only "modest"). The paradigm that Congress had in mind is that large-scale "drug traffickers often have the resources and foreign contacts to escape to other countries," and that forfeiture of a high bond amount may be a "cost of doing business" that renders them "special flight risks."  *Palmer-Contreras*, 835 F.2d at 17.

Motion for Release from Detention

7

Further, the Bail Reform Act[1] does not authorize pretrial detention based solely on a finding of dangerousness. *See United States v. Twine*, 344 F.3d 987 (9th Cir. 2003). Empirically, the presumption of detention is a poor predictor of whether defendants released on conditions will commit new offenses or violations, or flee or fail to appear. "High risk presumption cases were found to pose no greater risk (or in some cases, less risk) than high-risk non-presumption cases of being rearrested for any offense, being rearrested for a violent offense, failing to appear, or being revoked for technical violations." Amaryllis Austin, *The Presumption for Detention Statute's Relationship to Release Rates*, Federal Probation 52, 58 (Sept. 2017).

Lastly, the risk of flight needs to be a "serious" one; it must be real and cannot be speculative or hypothetical. *See United States v. Madoff*, 586 F. Supp. 2d 240, 247-50 (S.D.N.Y. 2009); *United States v. Gentry*, 455 F. Supp. 2d 1018 (D. Ariz. 2006); *United States v. Giordano*, 370 F. Supp.2d 1256 (S.D. Fla. 2005); *United States v. Giampa*, 755 F. Supp. 2d 665 (W.D. Pa. 1990). Finally, the Bail Reform Act, by its express terms, permits a defendant to revisit prior adverse findings:

----

[1] Calling it the Bail Reform Act is something of a misnomer. A more apt title would be the Bail Elimination Act. In 1984, prior to its passage, just 2% of federal defendants were detained pre-trial. By 2014, that number rose to 72%, an oddity where detention is supposed to be the exception to the rule. *See Salerno*, 481 U.S. at 755 (noting that "liberty is the norm, and detention prior to trial or without trial is the carefully limited exception"). The numbers speak for themselves, however. *See* https://www.bjs.gov/content/pub/pdf/prd-bra84.pdf; https://www.bjs.gov/content/pub/pdf/fjs14st.pdf.
Motion for Release from Detention

1

2    The judicial officer may, by subsequent order, permit the temporary release
     of the person, in the custody of a United States marshal or another appropriate
3    person, to the extent that the judicial officer determines such release to be
     necessary for preparation of the person's defense or for another compelling
4    reason.

5    18 U.S.C. § 3142(i).  It does not define what constitutes a "compelling" reason, although

6    the COVID-19 pandemic would appear to be compelling by almost any measure, and

7    courts have begun relying on this provision on ordering the release of pre-trial detainees.

8    *See, e.g.*, *United States v. Stephens*, 2020 U.S. Dist. LEXIS 47846, at *7-9 (S.D.N.Y. Mar.

9    19, 2020); *United States v. Michaels*, 2020 U.S. Dist. LEXIS 56239, at *3 (C.D. Cal.  Mar.

10   26, 2020).

11

12   **The COVID-19 Pandemic Constitutes an Extraordinary Public Health Risk**

13        The Coronavirus threatens the land in a way that an infectious disease has not

14   for a century.  Infectious disease specialists described COVID-18 as a "novel zoonotic

15   coronavirus that has been identified as the cause of a viral outbreak that originated in

16   Wuhan, China in December 2019 . . . [which attacks the respiratory system and] makes

17   certain populations of people severely ill."  Declaration of Dr. Jonathan L. Golob, at ¶¶ 1-

18   2, attached as Exhibit A. "The COVID-19 outbreak in Seattle has resulted in the need for

19   unprecedented public health measures, including multiple efforts to facilitate and enforce

20   social distancing."  Golob Declaration, at ¶ 12.  "The only way to mitigate [and prevent

21   the rapid spread of] COVID-19 is to use scrupulous hand hygiene and social distancing."

22   Declaration of Dr. Robert L. Greifinger, at ¶¶ 4, 8, attached as Exhibit B.  The virus

23

24

25   Motion for Release from Detention

outbreak reached pandemic status, after the World Health Organization labelled it as such on March 11, 2020[2].

Worldwide to date, there have been over 1.2 million cases and more than 67,000 attributable deaths[3].  The president declared a national emergency on March 13, 2020. Charlie Savage, *Trump Declared an Emergency Over Coronavirus. Here's What It Can Do*, N.Y. TIMES, March 13, 2020.  In order to attempt to minimize transmission of the disease, the White House imposed social distancing guidelines first on March 16, 2020, and then again on March 29, through the end of April.  Michael D. Shear, *Trump Extends Social Distancing Guidelines Through End of April*, N.Y. TIMES, March 29, 2020. Governor Inslee, meanwhile, issued a stay-at-home order on March 23, after local Yakima health issues issued their own stay-at-home order the day before.  Jim Brunner & Daniel Beekman, *Washington Governor Issues Two-Week Stay-At-Home Order*, SEATTLE TIMES, March 23, 2020.

The numbers are grim, particularly in the United States, which appears to have the dubious distinction of the highest number of confirmed cases (by a wide margin), and the most deaths except for Italy and Spain.  The Centers for Disease Control reports over 330,000 confirmed cases in the United States to date, with 8,910 deaths resulting from

---

[2] https://www.who.int/emergencies/diseases/novel-coronavirus-2019/events-as-they-happen.

[3] https://who.sprinklr.com/.  The reported numbers are only a snapshot in time, imperfect for multiple reasons, and sadly appear constantly on the increase.  Thus, they will be significantly out of date on April 14, the date of the hearing on the motion.

Motion for Release from Detention

the virus[4]. These numbers, sadly, will be out of date in between the time this memorandum is briefed and submitted, as they are constantly on the rise. As of April 5, there were almost 8,000 confirmed cases in Washington State, with 338 deaths[5]. Benton County has 166 confirmed COVID-19 cases, with 13 deaths resulting from the virus. The numbers are similar for Yakima County: 316 confirmed cases, with 12 deaths. *Id.* These numbers are sure to rise, and of course, they do not account for the large number of people who have acquired the Coronavirus either without knowing it or without having been tested for confirmation, as many people appear to be asymptomatic[6]. Meanwhile, the Benton County Jail, where Mr. Orduno has been housed since February 20, and the Yakima County Jail, where he had been held until transfer to Benton County, have yet to report any known or confirmed cases in either facility. That is likely to change at some point, as discussed below.

The risk for the community at large, significant as it is, is magnified exponentially for those in custodial confinement, especially jails and prisons. Keeping a safe distance from others, and constant hand-washing and other sanitary measures are some of the

---

[4] https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html

[5] https://www.doh.wa.gov/Emergencies/Coronavirus.

[6] https://www.propublica.org/article/what-we-need-to-understand-about-asymptomatic-carriers-if-were-going-to-beat-coronavirus; https://www.nytimes.com/2020/03/31/health/coronavirus-asymptomatic-transmission.html; https://www.thedailybeast.com/italys-covid-19-cases-likely-ten-times-higher-than-official-numbers-says-official.

Motion for Release from Detention

most effective ways to slow the spread of the virus, but that lifestyle belies the reality of conditions in custody and what is realistic and feasible. Inmates are at an acute risk of transmission. "The coronavirus is spreading quickly in America's jails and prisons, where social distancing is impossible and sanitizer is widely banned, prompting authorities across the country to release thousands of inmates in recent weeks to try to slow the infection, save lives and preserve medical resources." Timothy Williams, Benjamin Weiser, William K. Rashbaum, *Prisoners 'Terrified' as Coronavirus Spreads Behind Bars*, N.Y. TIMES, March 30, 2020. The recent increase in positive cases and death has been accompanied by an increase in the number of news and media articles focused on COVID-19 in detention facilities. *See, e.g.*, Daniel A. Gross, *'It Spreads Like Wildfire': The Coronavirus Comes to New York's Prisons*, THE NEW YORKER, Mar. 24, 2020; Reuters, *Spread of Coronavirus Accelerates in U.S. Jails and Prisons*, Mar. 28, 2020. To date, over 250 inmates and staff at BOP facilities have been infected by COVID-19, and that number continues to increase[7].

According to one noted epidemiologist, it is an "urgent priority in this time of national public health emergency to reduce the number of persons in detention as quickly as possible." Declaration of Dr. Chris Beyrer for Persons in Detention and Detention Staff, at ¶ 17, available at http://www.wisconsinappeals.net/wp-

---

[7] https://www.bop.gov/coronavirus/

Motion for Release from Detention

content/uploads/2020/03/Beyrer-Declaration-C3.pdf.  Dr. Beyrer notes that jails and

prisons are at increased risk for transmission of infectious diseases because of the

conditions inherent in such environments, including "overcrowding, population density

in close confinement, insufficient ventilation, shared toilet, shower, and eating

environments and limits on hygiene and personal protective equipment such as masks

and gloves in some facilities."  *Id*. at ¶¶ 11, 14; Golub Declaration, at 13 (noting it is

"reasonable to expect COVID-19 will also readily spread in detention centers,

particularly when residents cannot engage in proper hygiene and isolate themselves from

infected residents or staff").  Another noted physician (discussing immigration detention

facilities, although defense counsel is unaware of any appreciable distinction with penal

facilities) frames the problem as such:

> Immigration detention facilities are enclosed environments, much like the
> cruise ships that were the site of the largest concentrated outbreaks of
> COVID-19. Immigration detention facilities have even greater risk of
> infectious spread because of conditions of crowding, the proportion of
> vulnerable people detained, and often scant medical care resources. People
> live in close quarters and cannot achieve the "social distancing" needed to
> effectively prevent the spread of COVID-19. Toilets, sinks, and showers are
> shared, without disinfection between use. Food preparation and food service
> is communal, with little opportunity for surface disinfection. Staff arrive and
> leave on a shift basis; there is little to no ability to adequately screen staff for
> new, asymptomatic infection.

Exhibit B, at ¶ 11.  Dr. Beyrer (author of the non-attached declaration) therefore

recommends, as a matter of public health, that [r]eleasing as many inmates as possible is

important to protect the health of inmates, the health of correctional facility staff, the

Motion for Release from Detention

health of health care workers at jails and other detention facilities, and the health of the community as a whole." Beyrer Declaration, at ¶ 19.

Policy makers have begun modifying operations. For example, Attorney General Barr has advocated the increased and urgent use of home confinement as an alternative to prison, in two directives to BOP officials within the past 10 days[8]. These same and similar concerns have begun manifesting themselves in a growing number of district court decisions from federal courts across the country.

Things have flipped. Whereas it may once have been the case (although we do not concede the proposition) that releasing a particular defendant posed a danger to the community, now, in many cases, because of the risk of transmission, it is the continued *detention* of many defendants that causes the greater danger and risk to the public good. *See United States v. McLean*, Crim. No. 19-380, slip op. at 4 (D.D.C. Mar. 28, 2020) ("Defendant's continued pretrial detention poses a risk to community safety, which the Court must weigh against the risk posed by his release to home confinement"); *United States v. Harris*, 2020 U.S. Dist. LEXIS 55339, at *2 (D. D.C. Mar. 26, 2020) ("The Court is convinced that incarcerating Defendant while the current COVID-19 crisis continues to expand poses a far greater risk to community safety than the risk posed by Defendant's release to home confinement on these strict conditions."); *United States v.*

---

[8] https://www.justice.gov/file/1266661/download;
https://www.justice.gov/file/1262731/download.
Motion for Release from Detention

*Ramos*, 2020 U.S. Dist. LEXIS 52586, at *1 (D. Mass. Mar. 26, 2020) (finding that

Ramos's "continued detention poses a risk of danger to himself and others").

It is not only the sickest, oldest or most vulnerable who are being released,

although many court orders have focused on that population demographic.  *See, e.g.*,

*United States v. Perez*, 2020 U.S. Dist. LEXIS 47515, at *1 (S.D.N.Y. Mar. 19, 2020)

(ordering release of 65 year-old defendant with COPD and "unique confluence of serious

health concerns and other risk factors"); *United States v. Garcia*, Case No. 95-cr- (E.D.

Wisc. Mar. 27, 2020) (granting application for compassionate release for 81 year old with

"severe and critical health conditions").  But courts have also issued release orders even

for those who might not otherwise appear to be most vulnerable in custody or those

whose circumstances have not changed much, if at all, since the initial bail determination.

*See Stephens*, 2020 U.S. Dist. LEXIS 47486, at *10;  *McLean*, Crim. No. 19-380, slip op.

at 4  ("As counsel for the Defendant candidly concedes, the facts and evidence that the

Court previously weighed in concluding that Defendant posed a danger to the community

have not changed - with one exception. That one exception - COVID-19 - however, not

only rebuts the statutory presumption of dangerousness, see 18 U.S.C. SS 3142(e), but

tilts the balance in favor of release"); *Davis*, 2020 U.S. Dist. LEXIS 55310, at *16

(ordering release of non-violent drug defendant in "excellent health" because COVID-19

outbreak allowed rebuttal of presumption, consideration of public health emergency's

impact on the danger of release, and conclusion that "continued incarceration poses a

greater risk to community safety than his release").  Thus, while it might make sense to

Motion for Release from Detention

focus first on the most vulnerable and give them the most in the way of indulgences, the risk is real and immediate for all in custody, no matter the condition of their immune or respiratory systems.  And of course, there is a risk that healthy persons at lesser risk are not manifesting symptoms, but can unknowingly transmit COVID-19 to persons at greater risk[9].  "The risk of overburdening the jail's healthcare resources, and the healthcare resources of the surrounding community is real." *Harris*, 2020 U.S. Dist. LEXIS 55339, at *1.

Further, courts have also released persons or reduced sentences for those serving their sentences and who therefore, unlike Mr. Orduno, have been proven guilty and lost the presumption of innocence.  *See United States v. Jepsen*, 2020 WL 1640232, at *10 (D. Conn. Apr. 1, 2020); *United States v. Hernandez*, 2020 U.S. Dist. LEXIS 58739, at *7 (S.D.N.Y. Apr. 1, 2020); *United States v. Powell*, Case No. 94-cr-316, Amended Order (D. D.C. Mar. 27, 2020); *United States v. Foster*, Case No. 14-cr-324, Memorandum and Order (M.D. Pa. April 3, 2020); *United States v. Williams*, Case No. 04-cr-95, Order (N.D. Fla. Apr. 1, 2020).  The same is the case for those who were to begin serving a sentence, but received deferred surrender dates because of COVID-19 or release pending sentencing.  *See, e.g.*, *United States v. Huang*, 2020 U.S. Dist. LEXIS

---

[9] European Centre for Disease Prevention and Control, *Rapid Risk Assessment: Coronavirus Disease 2019 (COVID-19) Pandemic: Increased Transmission in the EU/EEA and the UK – Seventh Update* (Mar. 25, 2020), https://www.ecdc.europa.eu/en/publications-data/rapid-risk-assessment-coronavirus-disease-2019-covid-19-pandemic ("[t]he proportion of pre-symptomatic transmission [has been] estimated to be around 48% to 62%").

Motion for Release from Detention

58355, at \*2 (N.D. Cal. Mar. 27, 2020); *United States v. Kennedy*, Case No. 18-cr-20315, Order Temporarily Revoking Detention (E.D. Mich. March 27, 2020).  It would be anomalous if the tentacles of mercy extended to those already convicted but not to those who still enjoy a presumption of innocence.  Relief comes in many forms and many postures, but these orders have the common denominator of courts taking steps that at times likely appear distasteful or otherwise unwarranted.

Courts have also recognized that the COVID-19 pandemic affects not just the safety of the community, but the risk of non-appearance as well.  Insofar as we are in a new world (even if only temporarily) of closed borders, stay-at-home orders, and travel restrictions, defendants have less incentive to flee (if to do so relies on risks of detection and putting themselves at risk of transmission in uncertain conditions), and less ability to do so than previously.  And courts have adjusted their approach, including revisiting previous findings.  *See In re Extradition of Alejandro Toledo Manrique*, 2020 WL 1307109, at \*1 (N.D. Cal. Mar. 19, 2020) (granting release in "extraordinary times" and noting that problem of flight risk is "to a certain extent been mitigated by the existing pandemic . . .[because] escape is riskier and more difficult now . . . [and w]hile the risk that Toledo will flee cannot be completely mitigated, certain release conditions will help"); *Ramos*, 2020 U.S. Dist. LEXIS 52586, at \*2 (finding that the "circumstances of the COVID-19 pandemic diminish the risk that Mr. Ramos will flee pending trial"); *Davis*, 2020 U.S. Dist. LEXIS 55310, at \*17 (noting that the "pandemic has significantly curtailed travel throughout the region, including through Governor Hogan's order today

Motion for Release from Detention

that all Marylanders stay at home, providing additional assurance that Davis would not leave the area even if he had the financial resources to do so"). Through strict conditions of release, the Court can be reasonably assured not only of the community's safety, but of Mr. Orduno's appearance for court proceedings.

### Conclusion

We acknowledge that there is some evidence of guilt and the presence of firearms in the vehicle may be concerning, but this case is not so aggravated by exceptionally violent or dangerous circumstances that should prevent Mr. Orduno's release amidst a pandemic that is highly dangerous and threatening in its own right. Nor are we proposing any kind of across-the-board rule that non-violent drug defendants must be released in all cases. Only that on balance, the risks of continued detention exceed those of release, and that Mr. Orduno can be released on strict conditions. We look forward to presenting these arguments at the hearing promptly, and respectfully ask for Mr. Orduno's release.

Motion for Release from Detention

Dated:    April 6, 2020

Respectfully Submitted,

S/Jeremy B. Sporn
Jeremy B. Sporn, NY 4779310
Attorneys for Jose M. Lopez-Orduno
Federal Defenders of
Eastern Washington and Idaho
306 East Chestnut Avenue
Yakima, Washington 98901
(509) 248-8920
Email:  Jeremy_Sporn@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that on April 6, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such filing to the following: STEPHANIE A. VAN MARTER, Assistant United States Attorney.

S/Jeremy B. Sporn
Jeremy B. Sporn, NY 4779310
Attorneys for M. Lopez-Orduno
Federal Defenders of
Eastern Washington and Idaho
306 East Chestnut Avenue
Yakima, Washington 98901
(509) 248-8920
Email:  Jeremy_Sporn@fd.org

Motion for Release from Detention